Jack Clayton KIRK, et al., Appellants,

v.

The STATE of Texas, Appellee.

No. 08–81–00163–CV.

Court of Appeals of Texas,
El Paso.

March 30, 1983.

Appellant's Rehearing Denied
May 25, 1983.

Bill G. Alexander, Larry Myrick, Law Offices of Bill Alexander, Odessa, George E. Gilkerson, Lubbock, for appellants.

John Steven Dwyre, Asst. Atty. Gen., Lubbock, Zoleta G. Courtney, Asst. Atty. Gen., Austin, for appellee.

Before STEPHEN F. PRESLAR, C.J., and WARD and OSBORN, JJ.

## OPINION

STEPHEN F. PRESLAR, Chief Justice.

This is a suit brought by the State of Texas against Appellants Jack Clayton Kirk, Robert (Bob) Anderson and the J–K Investment Company, Inc. alleging violations of the Texas Securities Act and the Deceptive Trade Practices Consumer Protection Act. Following trial by jury, the court granted a permanent injunction against the Defendants, restitution for investors and civil penalties against the Defendants. Anderson and Kirk appeal. We affirm.

In early 1980, Kirk and Anderson, operating as J–K Investment Company, Inc., initiated a program in the Midland-Odessa area of West Texas whereby people leased cash to the J–K Investment Company, Inc. Different types of contracts were used, each containing a reasonable number of "whereases" and "therefores" and reciting the payment of cash in increments of $1000.00 by the investors, plus a $100.00 bookkeeping fee. The oral representations made to the potential investors were that their investments would multiply by ten each year and that a $1000.00 investment left in the program without profit taking would amount to almost one million dollars in three years. Potential investors were told that there was very little risk in putting their money into the program and that upon written notice their money plus earnings would be returned in seventy-two hours. They were told that their money would be invested in double "A" or triple "A" rated municipal bonds; that the bonds would be placed with the bank for a line of credit to deal in the precious metals markets; that they had access to a computer costing over $900,000.00 and capable of calculating price differentials in precious metals faster than other systems for an advantage in the precious metals market and that in dealing in that market the lowest daily profit the company makes was 1½% and the highest daily profit was as much as 368%. Also, they were told that a new motor vehicle valued up to $20,000.00 would be leased to a $2000.00 lessor/investor for another $2000.00 lease and the vehicle would be owned by the end of three years for a $1.00 payment. Also, for an additional $4000.00, the lessor could obtain a motor vehicle valued up to $40,000.00, under the same plan. J–K Investment Company, Inc. was alleged at times to be a Texas corpora-

tion and at other times an out of state corporation. It was in fact neither. Contracts were also negotiated with the National Charter Management and Financial Services, Inc. of California. There was a "parent" company in California which turned out to be operated by two felons, a fact not revealed to investors. In less than four months, Appellants received approximately $1,000,000.00 from some three hundred people for investment in the lease program.

Kirk testified that as the money was accumulated, he would send it in the form of cashiers' checks to the American Security Bank and Trust, a "bank" in Anguilla, West Indies. The proof showed that it was never much more than a paper bank and was at the time of trial in liquidation. Some time after this program got under way, certificates of deposit on this bank were sent to the investors; the certificates provided on their face that they would pay 17% interest, but they were non-negotiable for a period of twelve months. Yet, an accompanying letter said they were negotiable.

This suit was brought by the Attorney General of the State of Texas on the grounds that the Attorney General and the Securities Commissioner believed that the Defendants, Jack Clayton Kirk, Robert (Bob) Anderson, J–K Investment Company, Inc., have engaged and are about to engage in acts and practices and a course of business which have constituted and will continue to constitute violations of the Texas Securities Act and Section 17.47, et seq., Chapter 17 of Texas Business and Commerce Code, Subchapter E, Deceptive Trade Practices and Consumer Protection Act. From the judgment rendered for the State, Kirk and Anderson appeal and have filed separate briefs.

Briefly, the special issue findings of the jury are that Kirk, Anderson and J–K Investment Company, Inc., sold or offered to sell, investment contracts as defined in the charge, 2, that they sold or offered to sell "evidence of indebtedness" as defined and 3, that they intentionally failed to disclose a material fact as defined in the charge concerning the offer for sale of contracts or "lease" agreements. By Special Issue No. 4, it was found that each acted as "securities dealer" as defined in the sale or offer of contracts or lease agreements and that Special Issue No. 5, a substantial portion of the business of the J–K Investment Company, Inc. consisted of acting as a dealer and offering to sell contracts or "lease" agreements and Special Issue No. 6,. that the J–K Investment Company, Inc. was the alter ego of Kirk. By Issue No. 7, which will be discussed more fully, it was found that Kirk, Anderson and J–K Investment Company, Inc. each used false, misleading or deceptive acts or practices in the conduct of their business of selling or offering to sell lease agreements or contracts. By Issue No. 8, it was found that some fifteen persons including the three defendants agreed to engage and engaged in the course of conduct which the parties knew had the capacity and tendency to deceive and which caused damage or harm. A list of some 300 persons was attached to Issue No. 9 and by it the jury was asked to find if any or all or some of them paid money for the program in question. Adjacent to the names on this list were columns for "identifiable persons, if any," "damages, if any" and "responsible party, if any." The jury was instructed that on a finding of "some" they were to refer to the list of names and answer "yes" in column one under identifiable persons for those they found paid money for the program and to answer "no" for those they found did not pay money for the program. By Issue 10, the jury was further instructed as to the list that if they found "all" or "some" they were to determine what amount of actual damages those individuals on the list of names sustained, and by Special Issue 11, the jury identified all three defendants as responsible parties who contributed by deceptive acts or practices to the placement of those named individuals on the list of names into the lease agreement program. Based on those jury findings, judgment was entered ordering restitution by the defendants of $899,900.00 to 298 persons, plus interest, civil penalties of $4000.00 for each defendant, continuation

of a receivership, and a permanent injunction.

Both Anderson and Kirk have submitted individual briefs and each brief will be discussed separately except where a related issue has been raised by both Appellants.

By his first point of error, Kirk contends that Special Issue No. 8 is an improper submission of the issue of conspiracy since that issue includes an improper definition, in that it does not include the essential elements of a civil conspiracy. The wording of Special Issue No. 8 is as follows:

> Do you find that any of the following person(s), companies and/or corporation(s) agreed to engage and engaged in a course of conduct which the parties knew had the capacity and tendency to deceive and which caused damage or harm.
>
> Please answer either "we do" or "we do not" to each of the following.

■ Then followed a list of persons and companies including the Appellants, as to each of whom the jury answered "we do." At trial, Kirk did not object to the submission of this special issue upon the grounds he is raising on appeal. He objected that the special issue was global. An objection to an issue which states that it is global is not good. *Brown v. American Transfer and Storage Co.*, 601 S.W.2d 931 (Tex.1980). Although Kirk is precluded from raising this argument, we will discuss it briefly to set the stage for the remainder of this opinion.

■ First, this is not a common law action for civil conspiracy. The cases relied upon by Kirk are inapplicable. *Schlumberger Well Surveying Corporation v. Nortex Oil & Gas Corporation*, 435 S.W.2d 854 (Tex. 1968); and *Kimsey v. Fore*, 593 S.W.2d 107 (Tex.Civ.App.—Beaumont, 1979, writ ref'd n.r.e.), have no application to this case brought by the Attorney General against people conspiring to obtain property by engaging in false, misleading or deceptive acts and practices in violation of Article 17.41, et seq., of the Texas Business and Commerce Code. In *Bourland v. State*, 528 S.W.2d 350 (Tex.Civ.App.—Austin, 1975, writ ref'd n.r. e.), the same contention that Kirk makes

here was advanced and the Court noted what is true of this case, that the State does not undertake the rather onerous burden of proving a conspiracy to commit actionable fraud. Said the Court, speaking through Justice Shannon, "We have found no cases in point involving a conspiracy to engage in false, misleading, or deceptive acts. However, applying the above general rules, it would seem that to show a conspiracy to engage in false, misleading or deceptive acts or practices in violation of Article 17.41 of the Texas Bus. & Comm.Code requires proof of an agreement to obtain property from others by engaging in a course of conduct which the parties know has a tendency or capacity to deceive." Special Issue No. 8 met that test and was proper under the pleadings and facts of this case which is a suit brought by the Attorney General on behalf of the State of Texas seeking an injunction to restrain certain alleged deceptive trade practices and for actual damages or restitution for the victims of such practices.

■ Kirk complains that the court erred in submitting Special Issue No. 7 because the issue (a) constituted direct advice to the jury of the effect of its answers, (b) was so indefinite as to allow the jury to speculate and not enable it to reach a verdict and (c) included a comment on the weight of the evidence by the trial judge. Special Issue No. 7 reads as follows:

> Do you find that any of the following person(s), company and/or corporation(s) used false, misleading or deceptive acts or practices in the conduct of their business of selling or offering to sell "lease" agreements or contracts.
>
> Please answer "We do" or "We do not" to each of the following:
>
> a. Jack Clayton Kirk
> b. Junior Robert Anderson
> c. J–K Investment Company, Inc.

#### Instruction Number Seven

You are instructed that the terms, "false, misleading or deceptive acts or practices" include, but are not limited to, any one or any combination of the following . . .

This was followed by six violations listed under Section 17.46(b) of the DTPA. Kirk's trial counsel did not make the objections to preserve the errors that his appellate counsel urges as to Special Issue No. 7. The objection there was that it was global and that it suggested an answer to the jury. As noted earlier, the global objection is not good. An objection to a charge must be made "distinctly" and "specifically." *Brown v. American Transfer and Storage Co.,* supra. Kirk's remaining contention is that the issue constitutes direct advice to the jury. To inform a jury of the effect of its answer is to inform the jury of the legal consequences of its answers to the submitted issue. *Texas Employers' Insurance Association v. Charles,* 381 S.W.2d 664 (Tex. Civ.App.—Texarkana, 1964, writ ref'd n.r. e.). As noted by the Supreme Court in *Spradling v. Williams,* 566 S.W.2d 561 (Tex. 1978), Section 17.46 of the Texas Consumer Protection Act largely covers what should be submitted. That section provides, "a. False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The act makes false, misleading or deceptive acts or practices unlawful and the State pled that these individuals had engaged in such deceptive trade practices. The jury was not informed of the results of their answer when they were simply asked to find whether or not the named individuals had used false, misleading or deceptive acts or practices in the conduct of their business.

Two hundred ninety-eight people were found to have paid money into the program and the court's judgment ordered the Appellants to make restitution for the amount paid in by each participant. This was accomplished by the jury first being asked to find if any or all of those named on a list of names attached to the charge "paid money for participation in the program described in association with the lease agreement." That was Issue 9 and by Issue 10 the jury was instructed that if they had answered "all" or "some" to Issue 9, they should then find the amount of "actual damages" if any which those listed have sustained.

■ Contrary to Appellant Kirk's assertion, the court did submit Issue No. 10 in terms of "actual damages." Complaint is made that Issues 9 and 10 contain no standard for guiding the jury in ascertaining damages, the contention being that damages should have been defined in terms of an amount that would fairly and reasonably compensate for the injuries, if any. Complaint is also made that the damage findings cannot stand because the jury was not asked and there has been no finding that those damages were caused by the Appellants. Also, it is urged that the trial court's judgment ordering restitution is invalid, because recission was not pleaded.

Appellants misconceive the nature of these proceedings and the law applicable. As stated in *Smith v. Baldwin,* 611 S.W.2d 611 (Tex.1980), "The DTPA does not represent a codification of the common law. A primary purpose of the enactment of the DTPA was to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in the common law fraud or breach of warranty suit." By Article 17.47 of the Texas Business and Commerce Code, the Consumer Protection Division of the Attorney General's office is authorized to bring suit if it has reason to believe that any persons engaging in or have engaged in or are about to engage in any act or practice declared to be unlawful by the subchapter. This is such a suit and by its first amended petition the State prayed for restitution or actual damages and, as noted, the judgment awards restitution to 298 identifiable persons. This is authorized by subchapter (d) of Article 17.47 which says, "The court may make such additional orders or judgments as are necessary to compensate identifiable persons for actual damages or to restore money or property, real or personal, which may have been acquired by means of any unlawful act or practice..." Compensation for actual damages, restitution or the restoration of money is thus statutorily provided for with its basis being the violation of the Act. Under the facts of this case, the error complained of in the submission of the damage issue

would be harmless. The only evidence of damage was the contract costs, that is, the amount of money being leased, and bookkeeping fee; thus all damages were stated in dollars and cents and all were admitted into evidence without objection from the records of the Appellants after being identified and acknowledged by them from the witness stand. The "lease" agreements were in evidence and each amounted to a receipt for its face amount. There is no evidence, pleading or argument of any other damages, so there was no need for the submission requested.

Anderson urges that only eight investors appeared as witnesses and they testified only as to their own individual investments. He urges that, other than those eight witnesses, there is no evidence as to which investors, if any, wanted their money out of the program; which investors, if any, failed to get their money out of the program; that in the absence of such evidence, proof of loss or damages fails. As indicated earlier, the list of persons and the amounts they invested were admitted into evidence without objection and clearly established the amount of money each investor had parted with. Anderson's argument overlooks the fact that this was a civil action governed by the Rules of Civil Procedure and Rule 94 requires that accord and satisfaction is an affirmative defense which must be specially pled. Appellants' answer was only a general denial, and no proof was offered or could have been offered of accord and satisfaction. The taking of the money by Appellants was proved, in fact admitted, and there was no suggestion it was returned.

■ Anderson also contends that he should not be held jointly and severally liable for the entire $899,000.00 judgment; that if he is liable for any sum, it would only be for the $239,000.00 in lease agreements which he negotiated. As discussed earlier, to show a conspiracy to engage in false, misleading or deceptive acts or practices, there must be proof of an agreement to obtain money from others by engaging in a course of conduct which the participants knew has a tendency or capacity to deceive.

*Bourland v. State,* supra. By Special Issue No. 8, the jury found that the Appellants "agreed to engage and engaged in a course of conduct which the parties knew had the capacity and tendency to deceive and which caused damage or harm." The joint and several liability arises from this finding. Each admitted to making to prospective investors the representations set out earlier in this opinion and accepting money from others based on such representations. Also, the evidence is that at one point in the venture Anderson was a partner with Kirk. It takes two to "agree" and the test of Bourland is satisfied by Issue No. 8.

■ Anderson also urges that there was variance in that the State pled that the Appellants had represented that the highest daily profit that had been made by trading on the precious metals market was 368 percent. At the trial, a tape was introduced into evidence where Anderson was addressing a group of prospective investors and he told them that the highest daily profit had been 700 percent. This was an evidentiary variance unlikely to cause harm of reversible magnitude. A variance between pleadings and proof has rarely been the source of harmful error and to be reversible it must be substantial, misleading, constitute surprise and be a prejudicial departure from the pleadings. *Stone v. Lawyers Title Insurance Corporation,* 554 S.W.2d 183 (Tex. 1977).

■ Complaint is made that the State failed to give notice as required under the Deceptive Trade Practice Act. The somewhat ambiguous language of the act is, "nothing herein shall require the Consumer Protection Division to notify such person that court action is or may be under consideration. Provided, however, the Consumer Protection Division shall, at least seven days prior to instituting such court action, contact such person to inform him in general of the alleged unlawful conduct." After providing that cessation of such conduct shall not render court action moot, there is a further provision that, "Such prior contact shall not be required, if in the opinion of the Consumer Protection Division, there

**846**

is good cause to believe that the person would evade service of process if prior contact were made or that such person would destroy relevant records if prior contact were made." The record in this case reflects that the State filed its petition May 7, 1980. On April 3, 1980, Appellant Anderson met with Jim Barnes, a criminal intelligence agent for the Texas Department of Public Safety, and John Dwyre, a representative from the Attorney General's office who was also the trial attorney in this case. At this meeting, Barnes told Anderson who he was, and all the men discussed the investment program. Anderson was not advised that he was violating the law. But, he was advised that what he was selling appeared to be a security and he had "better look at it real close because they could be in a world of trouble." He was also advised that the program was being investigated, but that no charges had been filed. Investigator Barnes held a similar meeting with Kirk on April 9, 1980. These meetings would seem to satisfy the requirement "contact such person to inform him in general of the alleged unlawful conduct." Also, before this case was tried there were two preliminary trials, one for injunction and one for appointment of a receiver. Surely, those trials would constitute prior contact and notice. Also, any requirement of notice was waived by the parties going to trial on their announcement of ready and not raising the issue of notice until near the end of the trial.

All points of error have been considered and all are overruled.

The judgment of the trial court is affirmed.